# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HASTINGS FUNERAL HOME, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0373-PWG |
| | ) | |
| CHARLES W. HASTINGS, | ) | |
| | ) | |
| Defendant. | ) | |

## MASTER'S REPORT

Date Submitted: August 22, 2022
Final Report: November 14, 2022

Scott G. Wilcox, Esquire, MOORE & RUTT, P.A., Wilmington, Delaware, *Attorney for Plaintiff Hastings Funeral Home, Inc.*

David C. Hutt, Esquire, Michelle Bounds, Esquire, MORRIS JAMES LLP, Georgetown, Delaware, *Attorneys for Defendant Charles W. Hastings*

**GRIFFIN, M.**

Pending before me is a dispute about a lease purchase agreement for real properties used in the operation of a funeral home business in Selbyville, Delaware. The new owner of a funeral home business sought to exercise the option to purchase the properties from the former owner under the agreement and began the process specified in the agreement for establishing the properties' sale price. Disputes arose between the parties concerning the process and the sale price. In its motion for summary judgment, the new owner seeks specific performance of the agreement to purchase the properties, damages, and attorneys' fees. In his cross-motion for summary judgment, the former owner denies the new owner's entitlement to specific performance or damages, arguing that the new owner is in material breach of the agreement, and seeks indemnification for his attorneys' fees under the agreement. I find that the evidence shows that the new owner is entitled to specific performance of the agreement, and recommend that the Court grant the new owner's motion for summary judgment, deny the former owner's cross-motion for summary judgment, order the sale of the properties and compensatory damages, and deny any award of attorneys' fees. This is a final report.

## I.    BACKGROUND

*A. Factual Background*

On May 4, 2014, William Bryan Bishop, Jr. purchased all the shares and assets of Plaintiff Hastings Funeral Home, Inc. ("HFH") from Defendant Charles W. Hastings ("Hastings").[1]  On July 1, 2014, the parties entered into a separate lease purchase agreement ("Agreement") for real property owned by Hastings and located at 19 South Main Street and 24 South Main Street, Selbyville, Delaware ("Properties") out of which HFH operates the business.[2]  The Agreement's initial five-year term ended on June 30, 2019, with HFH having the option to renew for two additional five-year terms.[3]  During the first and second terms, HFH had the option to purchase the Properties.[4]  The Agreement stated that HFH will purchase the Properties at their "then fair market value" to be agreed upon by HFH and Hastings.[5]  If the parties could not agree on the fair market value price, the Agreement provided a mechanism for determining fair market value ("Pricing Process"):

---

[1] Docket Item ("D.I.") 1, ¶¶ 4-5.  HFH was founded in 1896 and purchased by Hastings around 1980, who operated the funeral home business until May 4, 2014. D.I. 30, at 4.

[2] D.I. 1, ¶ 6; D.I. 30, Ex. A.

[3] D.I. 30, Ex. A, art. 2; *id.*, art. 20.

[4] *Id.*, art. 21(b).  At the end of each term, if HFH did not exercise the option to renew under the Agreement, it was obligated to purchase the Properties. *Id.*, art. 21(a).

[T]he fair market value shall be determined by calculating the average fair market value based upon two appraisals commissioned independently by [HFH] and [Hastings] and prepared by MAI, Delaware Licensed Appraisers, provided that any difference between the value does not exceed ten (10%) percent.  If such difference is greater than ten (10%), then [HFH] and [Hastings] shall instruct those MAI, Delaware Licensed Appraisers to appoint a third MAI, Delaware Licensed Appraiser to prepare a third appraisal, the cost of which shall be born equally by [HFH] and [Hastings].  If the three MAI, Delaware Licensed Appraisers cannot agree on the fair market value of the [Properties], then [Hastings] and [HFH] shall be bound by the appraisal of the mutually chosen third MAI, Delaware Licensed Appraiser.  In the event that [HFH] exercises the option, [HFH] and [Hastings] shall have thirty (30) days after the giving of notice by [HFH] of its intention to exercise the option to obtain the appraisals at their own expense of their own MAI, Delaware Licensed Appraiser.  The third appraisal, if necessary, shall be obtained within thirty (30) days thereafter.[6]

If HFH exercised its option to purchase the Properties during one of the renewal terms, it must notify Hastings in writing and the "purchase of the Propert[ies] shall then take place ninety (90) days after the exercise of the option (unless the parties mutually agree to an alternate date)."[7]

The Agreement contains a time is of the essence clause.[8]  It also includes a default provision requiring that Hastings provide HFH with written notice of, and the opportunity to cure, any breach of a material term or condition of the Agreement, with HFH having 30 days to cure any default, unless the period was

---

[5] *Id.*, art. 21(d).

[6] *Id.*

[7] *Id.*, art. 21(b).

3

reasonably extended.[9]  The Agreement contains an indemnification clause ("Indemnification Clause") providing that HFH indemnifies Hastings for claims and expenses, including attorneys' fees, in defense of claims or causes of action initiated against Hastings that arise "by, from or through [HFH's] use, occupancy and possession of the Propert[ies]."[10]  It also includes a prevailing party provision ("Prevailing Party Provision") requiring that HFH reimburse Hastings for all expenses, including attorneys' fees, arising from or in connection with a default by HFH, if Hastings is the prevailing party in the dispute.[11]

On January 10, 2019, prior to the end of the Agreement's initial term, HFH exercised its option to renew for another five-year term.[12]  On May 13, 2019, Hastings responded regarding the rent increase for the second term, provided notice that HFH had breached the Agreement by subletting a portion of the Properties, and asked HFH to pay him the rent collected to cure the default.[13]  On September 4, 2019, HFH notified Hastings that it was exercising its option to

---

[8] *Id.*, art. 26(b), (d).

[9] *Id.*, art. 22. *See id.*, art. 22(d) (providing that the cure period is reasonably extended "if [HFH] has timely commenced and is diligently pursuing a cure of the default").

[10] *Id.*, art. 15(e).

[11] *Id.*, art. 23(f).

[12] *Id.*, Ex. B.

[13] *Id.*, Ex. C.

purchase the Properties.[14]  Hastings responded, on September 12, 2019, that the purchase could not proceed because HFH had not cured the default nearly four months after Hastings provided notice of the default, but that, if HFH paid the rent collected, Hastings "would be glad to discuss the sale of the [Properties]."[15]  HFH made the requested payment on September 18, 2019, and indicated that the 30-day appraisal period should begin on that date.[16]

On December 6, 2019, Hastings wrote to HFH, stating that he was "sorry it took so long," but he was ready to sell the Properties for $950,000.00.[17]  HFH responded, on December 20, 2019, that it did not agree that $950,000.00 was the fair market value price and that the Pricing Process needed to be followed.[18]

HFH had obtained an appraisal on August 26, 2019 from Harold L. Carmean ("Carmean"), who was a Delaware certified appraiser but not MAI-certified.[19] Carmean appraised the Properties at $637,500.00.[20]  HFH provided the Carmean appraisal to Hastings on February 27, 2020, and asked to receive a copy of Hastings' appraisal "as soon as possible," given the 30-day period to obtain

---

[14] *Id.*, Ex. D.

[15] *Id.*, Ex. E.

[16] *Id.*, Ex. F.

[17] *Id.*, Ex. G.

[18] *Id.*, Ex. H.

[19] *Id.*, Ex. I.

[20] *Id.*

appraisals in the Agreement.[21]  On March 3, 2020, Hastings responded that the appraiser he hired, William McCain ("McCain"), had completed his appraisal of the Properties in October 2019 but did not provide a copy of the McCain appraisal to HFH.[22]  On March 24, 2020, HFH again asked for a copy of the McCain appraisal, which Hastings mailed to HFH on March 27, 2020.[23]  McCain, who was a MAI and Delaware certified appraiser, appraised the Properties at $925,000.00, as of October 3, 2019.[24]  HFH communicated with Hastings by email on May 1, 2020, indicating that, since the difference in the appraisals' values exceeded ten percent, the parties' appraisers had agreed to Georgia Nichols ("Nichols"), a MAI and Delaware certified appraiser, as the third appraiser, and sought his approval, and payment of one-half of the cost, to retain the third appraiser.[25]  Hastings agreed to retain Nichols and signed the engagement letter on May 15, 2020.[26]  Nichols concluded, in her June 16, 2020 appraisal, that the market value of the Properties was $850,000.00 as of June 5, 2020.[27]  Hastings sent a June 19, 2020 email to HFH

---

[21] *Id.*

[22] *Id.*, Ex. J.  Hastings wrote HFH a week later indicating that he knew the appraised values weren't "even close," was asking his appraiser to review the Carmean appraisal, and would provide a copy of the McCain appraisal after that review. *Id.*, Ex. K.

[23] D.I. 32, at 7; D.I. 30, Ex. O.

[24] D.I. 30, Ex. N.

[25] *Id.*, Ex. R.

[26] *Id.*; *id.*, Ex. S, Addendum B.

[27] *Id.*, Ex. S, at 65.

stating that he will not move forward on the Properties' sale until the other appraisers discuss the Nichols appraisal.[28]

On July 9, 2020, Hastings wrote HFH stating that it has come to his attention that Carmean was not a MAI-certified appraiser as required by the Agreement so HFH was "going to have to start all over and hire an MAI Delaware appraiser to appraise the [Properties]" but, to avoid "gambling on the outcome of a new appraisal," HFH can pay Hastings $900,000.00.[29] HFH then hired a new MAI-certified appraiser, John Crognale ("Crognale"), who valued the properties at $615,000.00, as of October 19, 2020, in an appraisal dated November 2, 2020.[30] On November 9, 2020, HFH sent the Crognale appraisal to Hastings, indicating that, although HFH believed that Hastings had waived his objection to Carmean's lack of MAI certification, it had commissioned the Crognale appraisal and, since the value difference for the Properties still exceeded ten percent, it asked whether Hastings would agree to using the Nichols appraisal as the third appraisal or wanted Crognale and McCain to select a new third appraiser.[31]

After HFH followed up with an email on December 28, 2020, Hastings replied, in a December 29, 2020 email, that he had not seen HFH's November 9,

---

[28] *Id.*, Ex. T.

[29] *Id.*, Ex. U.

[30] *Id.*, Ex. V.

[31] *Id.*

2020 letter previously, questioned whether HFH was asking to use the Nichols appraisal as the third appraisal, and indicated that he would get back to HFH after consulting with his attorney and appraiser.[32]  HFH confirmed that it was asking whether the parties needed to hire a new third appraiser and set a response date of approximately ten days, to which Hastings responded that he will not make a decision by that date.[33]  Later on December 29, 2020, HFH responded that, if Hastings preferred, they could get the "the three appraisers [to] talk to see if they can come to a mutually agreed amount."[34]  After HFH emailed Hastings on January 20, 2021 regarding his failure to respond to the December 29, 2020 email,[35] Hastings replied, on January 25, 2021, that HFH had breached a material term or condition in the Agreement because Carmean lacked MAI certification and the Agreement did not provide for additional appraisals.[36]  He further stated that he had "fulfilled [his] obligation" under the Agreement and was "not required to recognize any redone appraisals or to spend any more money on appraisals," and offered alternative price offers.[37]

---

[32] *Id.*, Ex. T.

[33] *Id.*

[34] *Id.*, Ex. W

[35] *Id.*

[36] *Id.*, Ex. X ("the [Agreement] does not have a provision allowing for an appraisal redo").

[37] *Id.*

HFH emailed Hastings on February 8, 2021 and on March 8, 2021, stating that the sale price was the Nichols appraisal's value of $850,000.00, as set by the Pricing Process.[38] Hastings responded in a March 9, 2021 email that he didn't recall HFH's "last offer," and, on March 12, 2021, HFH reiterated the $850,000.00 price.[39] On March 21, 2021, Hastings submitted additional price offers, which HFH rejected.[40] Hastings' March 26, 2021 letter reiterated that that the Agreement does not provide for a "do-over" since Carmean is not MAI-certified, and continued to provide alternative offers.[41]

## B. Procedural History

On April 29, 2021, HFH filed a complaint claiming Hastings breached the Agreement and seeking specific performance of the Agreement, damages representing rent paid by HFH during the dispute, and attorneys' fees.[42] Hastings filed a motion to dismiss on June 4, 2021, arguing that HFH was not entitled to specific performance or damages.[43] HFH responded, on July 17, 2021, that it had

---

[38] D.I. 32, Ex. O; HFH's February 8, 2021 email indicated that the Agreement provides for the use of the third appraiser's value because the parties' appraisers will not agree to using the other's value. *Id.*

[39] *Id.*

[40] *Id.*

[41] D.I. 30, Ex. Z.

[42] D.I. 1. HFH continues to pay rent under the Agreement. *Id.*, ¶¶ 19, 20.

[43] D.I. 5.

met its pleading burden for specific performance and damages.[44]  In a November 29, 2021 final master's report ("November 29, 2021 Master's Report"), I denied the motion to dismiss.[45]  Hastings filed an answer and a counterclaim seeking indemnification under the Agreement for his attorneys' fees defending this action.[46]  Discovery followed and, on June 23, 2022, HFH filed an answer to Hastings' counterclaim.[47]  On July 22, 2022, HFH filed its opening brief in support of its motion for summary judgment ("Motion"),[48] and Hastings filed its motion for summary judgment and opening brief in support of its motion ("Cross-Motion").[49] On August 22, 2022, HFH and Hastings filed their answering briefs in opposition to the other party's motion for summary judgment.[50]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only where "the moving party demonstrates the absence of issues of material fact and that it is entitled to

---

[44] D.I. 9.

[45] D.I. 12 (holding that the Agreement does not lack a sufficiently definite price term for the Properties; the Pricing Process is not a condition precedent to the obligation to purchase or sell the Properties under the Agreement; waiver and damages have been sufficiently pled by HFH; and it is reasonably conceivable that HFH can prove the balance of equities tips in its favor).  The November 29, 2021 Master's Report was adopted by the Chancellor on December 14, 2021. D.I. 13.

[46] D.I. 14.

[47] D.I. 27.

[48] D.I. 30.

[49] D.I. 31; D.I. 32.

[50] D.I. 36; D.I. 37.

judgment as a matter of law."[51]   Evidence must be viewed "in the light most favorable to the non-moving party."[52]   "In evaluating the summary judgment record, a trial court shall not weigh the evidence or resolve conflicts presented by pretrial discovery."[53]   Summary judgment may not be granted when material issues of fact exist or if the Court determines that it "seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[54]

When the Court is presented with cross-motions for summary judgment, the Court may "deem the motions to be the equivalent of a stipulation for decision,"[55] but "[t]he existence of cross-motions … does [not] change the standard for summary judgment."[56]   In evaluating cross-motions for summary judgment, the court examines each motion independently and only grants a motion for summary

---

[51] *Wagamon v. Dolan*, 2012 WL 1388847, at *2 (Del. Ch. Apr. 20, 2012); *see also Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *2 (Del. Ch. Sept. 3, 1996), *aff'd,* 692 A.2d 411 (Del. 1997).

[52] *Williams v. Geier*, 671 A.2d 1368, 1375-76 (Del. 1996) (citing *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 844 (Del. 1987)).

[53] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005).

[54] *In re Est. of Turner*, 2004 WL 74473, at *4 (Del. Ch. Jan. 9, 2004) (quoting *Holladay v. Patten*, 1995 WL 54437, at *3 (Del. Ch. Jan. 4, 1993)) (internal quotation marks omitted); *see also Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

[55] Ct. Ch. R. 56(h).

[56] *Bernstein v. Tact Manager, Inc.*, 953 A.2d 1003, 1007 (Del. Ch. 2007).

judgment to one of the parties when there is no disputed issue of material fact and that party is entitled to judgment as a matter of law.[57]

## III.  ANALYSIS

The issues before me on summary judgment are whether HFH is entitled to specific performance of the Agreement to purchase the Properties, damages representing rent paid by HFH to Hastings, and an award of attorneys' fees under the bad faith exception.  In addition, I consider whether Hastings should be indemnified for his attorneys' fees in this action under the Agreement.  I address each issue below.

### A.  *HFH is Entitled to Specific Performance of the Agreement.*

Hastings argues that specific performance of the Agreement cannot be granted because HFH's failure to follow the Pricing Process (by not obtaining a MAI-certified appraiser initially and by not complying with the time periods specified for the process when the Agreement had a time is of the essence clause) renders the Properties' price indefinite, is a material breach of the Agreement, and the equities tip in Hastings' favor.[58]  In contrast, HFH asserts that Hastings waived the applicable time requirements through his conduct and is equitably estopped

---

[57] *See Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del. 1988); *Wimbledon Fund LP v. SV Special Situations LP*, 2011 WL 378827, at *7 (Del. Ch. Feb. 4, 2011).

[58] D.I. 32, at 13-26.

from enforcing those time periods.[59]  It claims that Hastings materially breached the Agreement, and the equities heavily favor it.[60]

With regard to the sale of the Properties, the Agreement provides that, after HFH exercises the option to purchase, the sale price is their fair market value at that time.[61]  If HFH and Hastings cannot agree on the fair market value of the Properties, the Agreement details a process for determining the sale price.[62]  First, HFH and Hastings commission independent appraisals of the Properties from "MAI, Delaware Licensed Appraisers" ("MAI-Certification").[63]  They have 30 days after HFH exercises the option to purchase to obtain those appraisals ("First Appraisals Period").[64]  If the difference in those appraisals exceeds ten percent, a third appraisal is obtained from a MAI, Delaware licensed appraiser selected by the first two appraisers, within 30 days after that ("Third Appraisal Period").[65]  If the three appraisers cannot agree on the sale price, then the parties are bound by the third appraisal.[66]  The Agreement provides that the purchase of the Properties takes place 90 days after the exercise of the option to purchase "unless the parties

---

[59] D.I. 36, at 5-13.

[60] *Id.*, at 13-15.

[61] D.I. 30, Ex. A, art. 21(d).

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

mutually agree to an alternate date" ("Sale Period," or collectively with the First Appraisals Period and the Third Appraisal Period, "Time Periods").[67]

A party seeking specific performance must establish, by clear and convincing evidence, that (1) an enforceable contractual obligation exists; (2) it has performed (or is ready, willing, and able to perform) its own obligations; and (3) that the balance of the equities tips in its favor.[68] "Specific performance is a remedy that is particularly suitable for land given its unique characteristics."[69] "The party seeking specific performance has the burden of proving entitlement by clear and convincing evidence."[70]

1. The Agreement is Valid and Enforceable.

I first address whether the Agreement is sufficiently definite to be enforceable. "[S]pecific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms."[71] "A contract is sufficiently definite and certain to be enforceable if the court can … ascertain what the parties have agreed to do."[72] The essential terms of a real estate

---

[66] *Id.*

[67] *Id.,* art. 21(b).

[68] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[69] *DeMarie v. Neff*, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005).

[70] *Peden v. Gray*, 886 A.2d 1278 (Del. 2005) (ORDER).

[71] *Osborn*, 991 A.2d at 1159.

[72] *Eagle Force Hldgs., LLC v. EF Invs., LLC*, 187 A.3d 1209, 1232 (Del. 2018).

contract are the names of the buyer and seller, description of the property to be sold, sales price or the means of determining the price, the terms and conditions of the sale, and the signature of the party to be charged.[73] Hastings argues that HFH's failure to comply with the Time Periods results in non-specific terms that renders the Properties' price indefinite.[74] I disagree. In the November 29, 2021 Master's Report, I concluded that the Agreement did not lack a sufficiently definite price term for the Properties since it provided a means of determining the price – the fair market value of the Properties at the time of sale – through the Pricing Process.[75] I further held that "HFH's failure to comply with all aspects of the [Pricing Process] in the Agreement does not affect the parties' intentions in making the Agreement or whether the Agreement's terms are definite."[76] As discussed more fully below, the parties' actions pertaining to the Agreement do not negate the Court's ability to ascertain the Properties' sale price.

2. <u>HFH has Proven it is Ready, Willing and Able to Perform under the Agreement.</u>

I consider whether HFH is ready, willing and able to perform its obligations under the Agreement. First, I consider Hastings' argument that HFH has failed to

---

[73] *Pulieri v. Boardwalk Properties, LLC*, 2015 WL 691449, at *5 (Del. Ch. Feb. 18, 2015).

[74] D.I. 32, at 13-16.

[75] D.I. 12, at 9.

[76] *Id.*

meet its obligations under the Agreement and materially breached the Agreement by failing to comply with the Time Periods and the time is of the essence clause.[77] HFH responds that Hastings waived enforcement of the Time Periods and breached the Agreement, by delaying, "continually fail[ing] to comply with any of the time periods," and "at no time … indicat[ing] or even appear[ing] to recognize the fact that the sale of the Propert[ies] was time sensitive."[78] As proof of Hastings' waiver, it points to Hastings' acceptance of the Carmean appraisal after the First Appraisals Period had elapsed, his continued price negotiation efforts beyond the Sale Period, and his July 9, 2020 letter indicating that HFH could seek a new appraisal from a MAI-certified appraiser.[79]

"Specific performance will not be granted to a party who is in default of a material obligation under the contract, unless that party is excused from performance of that obligation."[80] "It is fundamental law that a party seeking a decree for specific performance of a contract must, himself, have performed within the time specified [for] his own obligations under the contract."[81] However, "[i]t is well settled in Delaware that contractual requirements or conditions may be

---

[77] D.I. 32, at 13-24.

[78] D.I. 36, at 6, 9-13.

[79] *Id.*, at 9.

[80] *Peden,* 886 A.2d at 1278.

[81] *Wells v. Lee Builders, Inc.*, 99 A.2d 620, 621 (1953) (citations omitted).

waived."[82]   "Waiver is the voluntary and intentional relinquishment of a known right."[83]  "A contractual requirement or condition may be waived where (1) there is a requirement or condition to be waived, (2) the waiving party must know of the requirement or condition, and (3) the waiving party must intend to waive that requirement or condition."[84]   "The standard for demonstrating waiver is 'quite exacting;' because waiver is redolent of forfeiture, 'the facts relied upon to demonstrate waiver must be unequivocal.'"[85]   "Waiver may be shown by a course of conduct signifying a purpose not to stand on a right and leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon."[86]

Here, the evidence shows that adherence to the Time Periods was waived. Hastings' first response after HFH exercised the option to purchase on September 18, 2019 was to offer his position on the sale price on December 6, 2019 – almost 80 days after HFH exercised the option to purchase.[87]   HFH responded 14 days later that it did not agree with Hastings' price, indicating that the appraisal process

---

[82] *In re Coinmint, LLC*, 261 A.3d 867, 893 (Del. Ch. 2021) (citations omitted).

[83] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citations omitted).

[84] *Id.*

[85] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *34 (Del. Ch. Mar. 30, 2017) (citations omitted).

[86] 28 Am. Jur. 2d Estoppel and Waiver § 194.

[87] *See supra* note 17 and accompanying text.

was triggered.[88]  From the beginning of the Pricing Process, the Time Periods were not followed because the parties had not determined they disagreed on the Properties' fair market value until long after the First Appraisals Period had ended on October 18, 2019 (or even after the Third Appraisal Period ended on November 17, 2019).  They had obtained the appraisals within the First Appraisals period,[89] but did not share their appraisals with each other until February 2020 (HFH) and March 2020 (Hastings, after repeated requests from HFH).[90]  The next step in the Pricing Process – obtaining a third appraiser if the difference between the first two appraisals exceeded ten percent – was not implicated until that occurred.[91]  After HFH sought Hastings' approval and payment for the third appraiser on May 1, 2020, Hastings agreed to hiring the third appraiser, and signed her engagement letter, on May 15, 2020.[92]  The third appraiser completed the Nichols appraisal on

---

[88] *See supra* note 18 and accompanying text.

[89] The evidence shows that HFH had obtained the Carmean appraisal on August 26, 2019 and Hastings had obtained the McCain appraisal on October 3, 2019, so they were in compliance with the plain language related to the First Appraisals Period. *See supra* notes 19, 24 and accompanying text; D.I. 30, Ex. A, art. 21(d).

[90] *See supra* notes 21, 23 and accompanying text.

[91] *See supra* note 65 and accompanying text.  Hastings would have known on February 27, 2020 that the difference exceeded ten percent but took no steps towards obtaining a third appraisal. *See supra* notes 21, 22, 25 and accompanying text.

[92] *See supra* note 26 and accompanying text.

June 16, 2020, which was far outside of the Third Appraisal Period, or the Sale Period, which ended on December 17, 2019.[93]

The evidence shows that Hastings never expressed any concern that the Agreement's time deadlines were not being met; instead he delayed and took ample time responding to HFH's communications seeking to move the Pricing Process forward. By executing the third appraiser's engagement letter on May 15, 2020, he acknowledged, and approved, in writing that the third appraisal was occurring outside of the Third Appraisal Period. It appears the first time Hastings mentioned any concern about the lack of compliance with the Time Periods was in his motion to dismiss.[94]

By executing the Agreement, Hastings knew of the Time Periods and the time is of the essence clause,[95] and was aware of the time passing while the Pricing Process progressed and that the Time Periods and the time is of the essence clause were not being followed. His conduct was unequivocal in signifying that the Time Periods and the time is of the essence clause were waived in this instance.[96]

---

[93] *See supra* note 27 and accompanying text.

[94] *See* D.I. 5, at 4-7.

[95] *See e.g., Sammons v. Andersen*, 968 A.2d 492 (Del. 2009) ("It is well settled in Delaware that a person is bound by the details of a document he signed even if he failed to inform himself of the details.").

[96] "Delaware courts will generally give substantial weight to [time is of the essence] provisions." *Twin Willows, LLC v. Pritzkur, Tr. for Gibbs*, 2021 WL 3172828, at *4 (Del. Ch. July 27, 2021). Courts, however, look to the conduct of the parties to determine whether time provisions in a contract, including a time is of the essence clause, are

Because of that waiver, I do not find that HFH materially breached the Agreement, or failed to satisfy its obligations related to the Time Periods and the time is of the essence clause here.

Next, I consider whether HFH's initial failure to use a MAI-certified appraiser prevents HFH's entitlement to specific performance of the Agreement. Hastings argues that HFH's failure to use a MAI-certified appraiser constituted a material breach since the MAI-certification requirement was specified in the Agreement and imposed heightened industry standards to ensure the "appraisal process was legitimate and fair."[97] HFH responds that it commissioned a new appraisal by a MAI-certified appraiser after Hastings complained about Carmean's lack of MAI-certification.[98]

The Pricing Process specifies that the appraisers be MAI-certified.[99] Carmean, who completed HFH's initial appraisal, was not MAI-certified.[100] After

---

controlling. *See HomeOwners Expert Serv., Inc. v. Bobb*, 1977 WL 5315, at *2 (Del. Ch. Mar. 15, 1977). Further, the language detailing the Sale Period specifically authorizes flexibility in the Sale Period, by allowing the parties to change the Sale Period if they "mutually agree to an alternate date." D.I. 30, Ex. A, art. 21(b).

[97] D.I. 32, at 15-16, 22.

[98] D.I. 30, at 22.

[99] *Id.*, Ex. A, art. 21(d).

[100] It appears that HFH may have been confused about Carmean's MAI-Certification. The Carmean Appraisal identifies Carmean as Delaware certified but does not mention MAI-certification. *Id.*, Ex. I. HFH's December 20, 2019 letter to Hastings identifies Carmean as MAI-certified, although other letters refer to using Delaware licensed appraisers. *See id.*, Exs. H, I.

the Nichols appraisal was completed, on July 9, 2020, Hastings wrote HFH asserting the Carmean appraisal was invalid since Carmean lacked the required MAI-Certification.[101] He stated that "it would seem that [HFH] is going to have to start all over and hire an MAI Delaware appraiser to appraise the [Properties]."[102]

I do not find that the MAI-Certification was waived by Hastings – the evidence does not show that Hastings intentionally relinquished that requirement.[103] Instead, I find the evidence shows that HFH cured any default of its use of a non-MAI-certified appraiser when it commissioned the Crognale appraisal after receiving Hastings' July 9, 2020 letter. In that letter, Hastings offered HFH the option to obtain an appraisal by a MAI-certified appraiser, which was, in effect, starting over.[104] The Agreement provides that HFH will not be considered to be in default if it fails to comply with a material term or condition of the Agreement until Hastings provides written notice of the default and HFH has 30 days to cure, although the cure period is reasonably extended if HFH is diligently pursuing the cure.[105] The approach to curing the default – starting over and obtaining a new appraisal by a MAI-certified appraiser – was proposed by

---

[101] *Id.*, Ex. U.

[102] *Id.*

[103] Hastings asserts that he only discovered Carmean was not MAI-certified immediately before complaining about it in his July 9, 2020 letter. D.I. 32, at 8.

[104] *See id.*, Ex. U.

[105] *See id.*, Ex. A, art. 22(d).

Hastings in his July 9, 2020 letter, and followed by HFH. Accordingly, I find that HFH cured any default regarding its failure to initially use a MAI-certified appraiser.[106]

### 3. The Equities Favor HFH.

Finally, I consider whether the balance of equities tip in HFH's favor to support its specific performance claim. Hastings argues that the equities tip in his favor because HFH breached the terms of the Agreement.[107] HFH responds that the equities weigh in its favor because it made every effort to complete the Agreement, in contrast to Hastings' conduct in contravention of the Agreement.[108] In balancing the equities for specific performance, the Court must consider whether "specific enforcement of a validly formed contract would cause even greater harm than it would prevent."[109] I find that the equities tip in HFH's favor since it has not breached the Agreement, and I recognize that the funeral home business it purchased from Hastings appears to have operated out of the Properties since before 1900.[110]

---

[106] HFH did not provide the new Crognale appraisal to Hastings until November 9, 2020, but Hastings' previous action regarding defaults (allowing HFH to cure the default four months after notice), and his failure to object to the Crognale appraisal because of timing, indicate that the time for the Crognale appraisal was reasonably extended. *See id.,* Ex. V.

[107] D.I. 32, at 25-26.

[108] D.I. 30, at 23-25.

[109] *Walton v. Beale*, 2006 WL 265489, at *7 (Del. Ch. Jan. 30, 2006).

[110] *See supra* note 1.

In conclusion, I find that that HFH has shown, by clear and convincing evidence, that it is entitled to specific performance of the Agreement and that the sale price for the Properties is $850,000.00, which is the fair market value as determined by the third appraisal and the sale price under the Agreement.[111] The sale of the Properties to HFH shall occur within 45 days after the order implementing this report is entered.

## B. Compensatory Damages for the Delay in the Properties' Transfer are Due.

HFH seeks the return of rent it paid to Hastings on the Properties beginning in August 2020 due to Hastings' breach by preventing closing on the Properties within the Time Periods.[112] Hastings argues that HFH's rent and specific performance claims fail for the same reasons, and rent is due until the sale is completed.[113]

---

[111] I recognize that my decision allows a gap in the Pricing Process – the step in which the three MAI-certified appraisers determine if they can mutually agree on the Properties' sale price. Given the duration of this dispute and the large disparity among the MAI-certified appraisers' valuations of the Properties across a relatively short time period – McCain appraised the Properties at $925,000.00 (as of October 2019), Nichols at $850,000.00 (as of June 2020), and Crognale at $615,000.00 (as of October 2020), I find that requiring the three MAI-certified appraisers to meet to determine if they can mutually agree on the sale would be a useless exercise and do not require that they do so. *See, e.g., W. Air Lines, Inc. v. Allegheny Airlines, Inc.*, 313 A.2d 145, 154 (Del. Ch. 1973). Therefore, the controlling provision in the Pricing Process compels the use the third appraisal to decide the sale price.

[112] D.I. 30, at 25; D.I. 36, at 13-14.

[113] D.I. 32, at 27; D.I. 37, at 22.

23

"Equity may, when its jurisdiction is invoked to obtain specific performance of a contract, award damages or pecuniary compensation along with specific performance when the decree as awarded does not give complete and full relief."[114] In ordering specific performance, the Court will "adjust the equities of the parties in such a manner as to put them as nearly as possible in the same position as if the contract had been performed according to its terms."[115]

> An order of specific performance ... will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice so requires. As is the case here, an order of specific performance seldom results in performance within the time the contract requires. To that end, damages for the delay will usually be appropriate.[116]

"Where the delay is on the part of the [seller], the purchaser is entitled to the rents and profits from the time when, according to the terms of the contract, possession should have been delivered, and the [seller] is entitled to a credit for the interest earned by the purchaser on the unpaid purchase money."[117] "[A] court of equity may award damages for what the purchasers have lost by reason of the seller's delay in conveying the property."[118] And, "equity *may* require a party to pay interest on the purchase price as a condition to obtaining specific performance

---

[114] *Tri State Mall Assocs. v. A. A. R. Realty Corp.*, 298 A.2d 368, 371 (Del. Ch. 1972).

[115] *Id.* at 371-72.

[116] *Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, 2021 WL 1714202, at *55 (Del. Ch. Apr. 30, 2021) (internal quotation marks and citations omitted).

[117] *Tri State Mall Assocs.*, 298 A.2d at 371.

where one party would otherwise inequitably receive a windfall at the other's expense."[119]

Here, the evidence shows that Hastings caused delay in the transfer of the Properties to HFH. After HFH obtained the Crognale appraisal, it shared the appraisal with Hastings on November 9, 2020, and inquired whether Hastings agreed to using the Nichols appraisal, or desired to have a new third appraiser selected.[120] Hearing no response from Hastings, HFH offered, on December 29, 2020, to have the three MAI-certified appraisers discuss the sale price.[121] Hastings did not respond to that offer either, but, on January 25, 2021, stated that he believed HFH had breached the MAI-Certification, he would not recognize "any redone appraisals," and he would do "[n]othing more."[122] Between January 25, 2021 and his March 26, 2021 letter, Hastings' communications with HFH contained varying sale price offers for the Properties that were not based on the Pricing Process.[123] Throughout that time HFH remained steadfast in its position that, under the Agreement, the third appraisal set the sale price at $850,000.00.[124]

---

[118] *Romero v. Killy*, 1987 WL 13521, at *7 (Del. Ch. July 1, 1987).

[119] *Vaughan v. Creekside Homes, Inc.*, 1994 WL 586833, at *3 (Del. Ch. Oct. 7, 1994).

[120] D.I. 30, Ex. V.

[121] *See supra* note 34 and accompanying text.

[122] *See* D.I. 30, Ex. X.

[123] *See supra* notes 39-41 and accompanying text.

[124] *See supra* notes 38-40 and accompanying text.

When asked about next steps under the Pricing Process, Hastings indicated he would not do anything else. He had an obligation to complete the Pricing Process and determine the sale price under the Agreement.

As of January 25, 2021, Hastings refused to move forward to complete the Pricing Process (although he continued to try to negotiate the sale price after that, he did so in contravention of the Pricing Process). On that date, the sale price could have been set at the third appraisal's value (based on the final method for determining the sale price in the Agreement), and HFH's purchase of the Properties could have occurred, under the Agreement. After the purchase, HFH would no longer owe rent on the Properties. So, to put the parties in as close as possible to the positions they would have been in if possession of the Properties had been delivered as of January 25, 2021, I find that rent paid on the Properties by HFH after that date should be credited against the sale price of $850,000.00.[125] In addition, if delivery had occurred, Hastings would have received the sale proceeds from HFH on January 25, 2021, and he is entitled to a credit for interest on the unpaid purchase money since January 25, 2021. Therefore, the rent paid by HFH to Hastings since January 25, 2021 should be deducted from the sale price, and pre-judgment interest at the legal rate on the $850,000.00 sale price should be added for the same period.

*C. Attorneys' Fees Should not be Awarded to Either Party.*

First, I consider Hastings' counterclaim that he is entitled to indemnification for his attorneys' fees to defend this action under the Agreement.[126] HFH refutes that the Indemnification Clause covers Hastings' defense in this case.[127] The Indemnification Clause provides that HFH will indemnify Hastings for attorneys' fees incurred "in defense" of actions initiated against him.[128] The Agreement also contains the Prevailing Party Provision, which requires HFH to reimburse Hastings for expenses, including attorneys' fees, when Hastings is the prevailing party in an action related to HFH's default under the Agreement.[129]

"Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[130] "One of the exceptions to the American Rule, however, is that parties may agree to shift fees contractually," through using indemnification provisions.[131] Indemnification clauses, however, "are presumed *not* to require

---

[125] HFH states that it has paid Hastings rent of $6,468.00 per month throughout this litigation. D.I. 30, at 16.

[126] D.I. 32, at 28.

[127] D.I. 30, at 32.

[128] *Id.*, Ex. A, art. 15(e).

[129] *Id.*, art. 23(f).

[130] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citation omitted); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014).

[131] *Paul Elton, LLC v. Rommel Delaware, LLC*, 2022 WL 793126, at *1 (Del. Ch. Mar. 16, 2022); *see also Dittrick v. Chalfant*, 2007 WL 1378346, at *1 (Del. Ch. May 8, 2007).

reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent."[132] "[P]urely contractual indemnification provisions only shift first-party claims if the contract explicitly so provides."[133] "When a contract contains both an indemnification provision and a 'prevailing party' provision elsewhere in the contract, the courts of this state will not construe the indemnification provision to allow first-party fee-shifting."[134] Here, the Agreement contains both the Prevailing Party Provision and the Indemnification Clause, which does not explicitly provide for first-party fee-shifting. As a result, I do not construe the Indemnification Clause as allowing for first-party fee-shifting, so Hastings' indemnification claim fails, and I recommend that the Court deny Hastings' claim for attorneys' fees.[135]

---

[132] *Paul Elton, LLC*, 2022 WL 793126, at *1 (internal quotation marks and citation omitted); *see also Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Nov. 22, 2016) ("Standard indemnity clauses are not presumed to apply to first-party claims.").

[133] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020), *aff'd sub nom. Herzog v. Great Hill Equity Partners IV, LP*, 269 A.3d 983 (Del. 2021).

[134] *Paul Elton, LLC*, 2022 WL 793126, at *2.

[135] Assuming *arguendo* that the Indemnification Clause would control and allow first-party fee-shifting, the Indemnification Clause provides for indemnification of "reasonably incurred attorneys fees," I would not shift fees since reasonable attorneys' fees are "related to the result achieved in the litigation" and HFH effectively prevails on all claims in this litigation. *Great Hill Equity Partners IV, LP*, 2020 WL 7861336, at *6.

Next, I consider HFH's claim for attorneys' fees under the bad faith exception to the American Rule. It argues that Hastings' conduct in delaying his responses to HFH's communications and taking baseless positions related to this matter before and during the litigation justifies an attorneys' fee award.[136] Hastings refutes HFH's claim that the bad faith exception applies.[137]

The bad faith exception to the American Rule applies only in "extraordinary cases" where the "losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[138] To apply the bad faith exception to pre-litigation conduct, courts determine whether "the pre-litigation conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages."[139] Courts have found bad faith for the conduct of litigation "where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[140] To find bad faith, a party must have acted in

---

[136] D.I. 30, at 28-31.

[137] D.I. 37, at 25-29.

[138] *Brice v. State, Dep't of Correction*, 704 A.2d 1176, 1179 (Del. 1998) (citations omitted).

[139] *Hardy v. Hardy*, 2014 WL 3736331, at *18 (Del. Ch. July 29, 2014).

[140] *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)) (internal quotation marks omitted); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

subjective bad faith, which "involves a higher or more stringent standard of proof, *i.e.,* 'clear evidence.'"[141]

It is evident that Hastings feels strongly about the sale of the Properties,[142] but the evidence does not show that his actions prior to litigation were so egregious as to justify awarding attorneys' fees as damages,[143] or that he acted for oppressive reasons, unnecessarily delayed the litigation, or knowingly asserted frivolous contentions, during litigation. Thus, I conclude that the high standard for awarding attorneys' fees for bad faith has not been met here and recommend that the Court decline to award attorneys' fees to HFH in this matter.

## IV. CONCLUSION

For the reasons stated above, I recommend that the Court grant Plaintiff Hastings Funeral Home, Inc.'s motion for summary judgment and deny Defendant Charles W. Hastings' cross-motion for summary judgment, and direct that Defendant sell the Properties located at 19 South Main Street and 24 South Main Street, Selbyville, Delaware to Plaintiff. I recommend that the Court conclude that the sale price for the Properties is $850,000.00 and that, beginning as of January 25, 2021, prejudgment interest at the legal rate should be added to the sale price,

---

[141] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997), *aff'd,* 720 A.2d 542 (Del. 1998) (citations omitted).

[142] *See* D.I. 30, Ex. J.

[143] Hastings states that he was proceeding *pro se* prior to litigation. D.I. 37, at 28.

and the rent paid by HFH to Hastings on the Properties should be subtracted, to determine the final amount of sale proceeds to be exchanged for the transfer of the Properties between the parties. I further recommend that the Court decline to award attorneys' fees to either party. This is a final report, and exceptions may be taken under Court of Chancery Rule 144. The parties shall submit an implementing order (reflecting reductions for rent and additions for interest) within 15 days of this report becoming final, and the sale of the Properties shall take place within 45 days after the implementing order is entered.

*/s/ Patricia W. Griffin*
Master Patricia W. Griffin